# United States Court of Appeals for the Federal Circuit

2009-1060
(Serial No. 08/692,201)


IN RE RICHARD S. LISTER

Peter M. Midgley, Jr., Zarian Midgley & Johnson PLLC, of Boise, Idaho, argued for appellant.  Of counsel was Rexford A. Johnson.

Joseph G. Piccolo, Associate Solicitor, Office of the Solicitor, United States Patent and Trademark Office, of Arlington, Virginia, argued for the Director of the United States Patent and Trademark Office.  With him on the brief were Raymond T. Chen, Solicitor, and Benjamin D.M. Wood, Associate Solicitor.

Appealed from:  United States Patent and Trademark Office
                            Board of Patent Appeals and Interferences

# United States Court of Appeals for the Federal Circuit

2009-1060
(Serial No. 08/692,201)

IN RE RICHARD S. LISTER

Appeal from the United States Patent and Trademark Office, Board of Patent Appeals and Interferences.

_____

DECIDED:  September 22, 2009

_____

Before GAJARSA, LINN and PROST, <u>Circuit Judges</u>.

PROST, <u>Circuit Judge</u>.

Dr. Richard Lister appeals from a decision of the Board of Patent Appeals and Interferences ("Board") that affirmed the examiner's rejection of claims 21-25 of his application under 35 U.S.C. § 102(b).  Because the record does not contain sufficient evidence that the prior art reference relied upon by the Board was publicly accessible more than one year prior to the date on which Dr. Lister filed his patent application, we vacate and remand.

## I.  BACKGROUND

Dr. Lister is a Ph.D. clinical psychologist and an avid sportsman.  In his earlier days, he competed regularly in organized golf tournaments.  However, he eventually grew tired of what he describes as the horrendously slow pace of a game of golf.

Although he discontinued his participation in tournaments, he continued to play casually. During this time, he realized that casual golfers have great difficulty with the ordinary requirement that, beginning with the second stroke on each hole, the ball must be hit while lying directly on the ground. This observation led him to conclude that recreational golfers would be able to obtain better scores in a shorter time if they were permitted to tee up their balls on every shot except for those taken from designated hazard areas or the putting green.

Dr. Lister described this method of playing golf in a manuscript entitled "Advanced Handicap Alternatives for Golf" ("the manuscript" or "the Lister manuscript"):

> It is strongly advocated that official sanction be given to the concept of a T handicap. That is, the unrestricted use of a golf tee or peg on any golf shot. Currently, it is allowed 18 times, but only when it is the first shot of the hole being played.
> The game otherwise would be played the same, including play in hazards of sand and water, where a tee would not be advocated or permitted. On the surface, this may appear to be a small and insignificant change. Ten years of careful research, by this Ph.D. clinical psychologist, sports psychologist, and former professional athlete, has found that a T handicap option would make a profound, positive influence on the game of golf.

Subsequently, Dr. Lister decided to seek intellectual property protection for his method of playing golf. Proceeding without the assistance of a lawyer, he submitted the manuscript to the United States Copyright Office ("Copyright Office") on July 4, 1994. The Copyright Office issued a certificate of registration on July 18, 1994. At some point in the future, Dr. Lister learned that he needed to obtain a patent rather than a copyright in order to protect his invention. On August 5, 1996, he filed an application with the United States Patent and Trademark Office ("USPTO").

The prosecution history of Dr. Lister's application is lengthy. Over the past thirteen years, Dr. Lister has gone through several rounds of rejections and amendments with the examiner and two appeals to the Board. Of the five claims that remain at issue, claim 21, the only independent claim, is representative:

> 21. A method for playing a game of organized golf wherein the improvement is that each participating player or group of players is permitted under the official or sanctioned rules of said game for normal play to raise or tee the ball up above turf level at any time during play, except for designated hazard areas and greens, and further comprising the step of recording the number of strokes taken by each participating player of [sic] group of players throughout said game for the purpose of comparing said number of strokes with the number of strokes of each other participating player or group of players or to an average or expected number of strokes for golf play in accordance with said game.

In the most recent final rejection, issued on January 31, 2003, the examiner rejected claims 21-25 as anticipated by the Lister manuscript under 35 U.S.C. §§ 102(a) and 102(b). In the examiner's view, the manuscript was sufficiently publicly accessible to be a printed publication within the meaning of § 102(b) because an interested researcher would have been able to find it by searching the Copyright Office's catalog by title.

On appeal, the Board reversed the § 102(a) rejection and affirmed the § 102(b) rejection. Ex parte Lister, No. 2006-0808 (B.P.A.I. Mar. 27, 2008). With respect to § 102(a), the Board pointed out that that subsection bars the patentability of inventions that have been described in a printed publication prior to the applicant's date of invention. Because "[Dr.] Lister could not have disclosed his own invention before he invented it," the Board concluded that the § 102(a) rejection was erroneous. Turning to § 102(b), which precludes the patenting of inventions that were described in a printed publication more than one year prior to the applicant's date of filing, the Board noted

that under In re Klopfenstein, 380 F.3d 1345 (Fed. Cir. 2004), the Lister manuscript must have been "publicly accessible" in order to have been a printed publication. The Board found that the copyright registration for the Lister manuscript was issued on July 18, 1994, more than one year prior to Dr. Lister's application date of August 5, 1996. It further concluded that an interested researcher would have been able to find the manuscript by searching the Copyright Office's catalog by title for the word "golf" in combination with the word "handicap." Additionally, the Board found that an individual seeking to view the manuscript would have been able to do so by visiting the Copyright Office. Finally, the Board rejected Dr. Lister's arguments that the inconvenience of visiting the Copyright Office and the Copyright Office's rules prohibiting individuals from making copies of the manuscript precluded a finding of public accessibility. With respect to the unavailability of copies, the Board found that the inventive concept was straightforward enough that it could be understood and retained by a person of ordinary skill in the art upon reading the manuscript without any need to obtain a copy.

In his request for rehearing before the Board, Dr. Lister argued that the manuscript was not publicly accessible because there was no evidence that it was actually accessed by anyone. Additionally, Dr. Lister argued that the Board erred by relying heavily on Klopfenstein, a case about whether a poster presentation at a conference was a printed publication, rather than citing more factually analogous cases, such as In re Hall, 781 F.2d 897 (Fed. Cir. 1986), and In re Cronyn, 890 F.2d 1158 (Fed. Cir. 1989), which involved single copies of documents housed in libraries. The Board rejected both arguments, concluding that evidence of actual access was not a requirement under SRI International, Inc. v. Internet Security Systems, Inc., 511 F.3d

1186, 1197 (Fed. Cir. 2008), and that the discussion of <u>Hall</u> and <u>Cronyn</u> in <u>Klopfenstein</u>, 380 F.3d at 1349, demonstrates that the law set forth in <u>Klopfenstein</u> is relevant to library cases. <u>Ex parte Lister</u>, No. 2006-0808, slip op. at 3-5 (B.P.A.I. July 22, 2008).

Dr. Lister timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(4) and 35 U.S.C. § 141.

## II. DISCUSSION

### A

"Whether an asserted anticipatory document qualifies as a 'printed publication' under § 102 is a legal conclusion based on underlying factual determinations." <u>Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc.</u>, 291 F.3d 1317, 1321 (Fed. Cir. 2002). We review the Board's factual determinations for substantial evidence, <u>In re Gartside</u>, 203 F.3d 1305, 1315 (Fed. Cir. 2000), and its legal conclusions de novo, <u>Klopfenstein</u>, 380 F.3d at 1347.

Section 102(b) is a bar to patentability if "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). "The bar is grounded on the principle that once an invention is in the public domain, it is no longer patentable by anyone." <u>Hall</u>, 781 F.2d at 898.

In order to qualify as a printed publication within the meaning of § 102, a reference "must have been sufficiently accessible to the public interested in the art." <u>Cronyn</u>, 890 F.2d at 1160 (quoting <u>Constant v. Adv. Micro-Devices, Inc.</u>, 848 F.2d 1560, 1568 (Fed. Cir. 1988)). "Because there are many ways in which a reference may be

disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication' bar under 35 U.S.C. § 102(b)." Hall, 781 F.2d at 898-99. Whether a reference is publicly accessible is determined on a case-by-case basis based on the "facts and circumstances surrounding the reference's disclosure to members of the public." Klopfenstein, 380 F.3d at 1350. A reference is considered publicly accessible if it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it." Kyocera Wireless Corp. v. Int'l Trade Comm'n, 545 F.3d 1340, 1350 (2008) (quotation marks omitted).

Prior cases have looked to a variety of factors when considering whether a reference was publicly accessible. In several cases involving references stored in libraries, we have considered whether the research tools available would have been sufficient to permit an interested researcher to locate and examine the reference. In Hall, for example, we held that a dissertation shelved in the stacks and indexed in the catalog at the Freiburg University library was a printed publication. 781 F.2d at 898, 899-90. In contrast, the thesis at issue in In re Bayer was held not to have been publicly accessible as of the critical date because at that time it was uncataloged, unshelved, and could have been found in the library at the University of Toledo "only by one having been informed of its existence by the [author's] faculty committee, and not by means of the customary research aids available in the library." 568 F.2d 1357, 1361 (CCPA 1978).

The differences in accessibility in Bayer and Hall were highlighted in Cronyn, where this court explained that "the critical difference between [Bayer and Hall] that explains the different results is that on the critical date in Bayer the thesis was 'uncatalogued and unshelved' and therefore not accessible to the public, whereas in Hall the 'dissertation was accessible' because it had been indexed, cataloged and shelved." 890 F.2d at 1161. At issue in Cronyn was a student's thesis housed in the main campus library and the chemistry department library at Reed College. Each library contained a collection of student theses and a corresponding set of index cards that listed the title and author of each thesis. Id. at 1159. The index cards were filed alphabetically by the author's last name, which, this court noted, "bears no relationship to the subject of the student's thesis." Id. at 1161. Although the index cards and the student theses were available for public examination, this court held that the theses were not publicly accessible because "they had not been either cataloged or indexed in a meaningful way." Id.

While cataloging and indexing have played a significant role in our cases involving library references, we have explained that neither cataloging nor indexing is a necessary condition for a reference to be publicly accessible. See Klopfenstein, 380 F.3d at 1348 ("[Our cases] do not limit this court to finding something to be a 'printed publication' only when there is distribution and/or indexing."). Depending on the circumstances surrounding the disclosure, a variety of factors may be useful in determining whether a reference was publicly accessible. See, e.g., id. at 1350 (listing four factors relevant to whether a slide presentation was a printed publication); Bruckelmyer v. Ground Heaters, Inc., 445 F.3d 1374, 1379 (Fed. Cir. 2006) (explaining

that an application that resulted in the issuance of a published Canadian patent was publicly accessible because the issued patent served as a "roadmap to the application file"); see also id. at 1380 (Linn, J., dissenting) (opining that the application was not publicly accessible because "the text of an issued patent does not generally serve to guide researchers to the file history for a more expansive disclosure of the described invention, and it certainly does not lead researchers to the file history for disclosure of subject matter not described in the issued text"). In short, we must consider all of the facts and circumstances surrounding the disclosure and determine whether an interested researcher would have been sufficiently capable of finding the reference and examining its contents.

With the framework of the public accessibility analysis established, we turn to the specifics of Dr. Lister's appeal.

B

Several of the facts that are pertinent to our public accessibility analysis are not in dispute. First, the parties agree that the Lister manuscript discloses the claimed invention. Next, it is undisputed that the Copyright Office issued a certificate of registration for the Lister manuscript on July 18, 1994. It is also undisputed that the Copyright Office retained a copy of the manuscript in Washington, D.C., that was available upon request to be inspected by the public. Additionally, the parties agree that, absent limited special circumstances, the Copyright Office will neither provide copies of the manuscript nor permit individuals inspecting the document to make copies

themselves.[1]  However, the parties do not agree as to when, if ever, the manuscript was listed in a catalog or index that would have permitted an interested researcher to learn of its existence and locate it for inspection.

Dr. Lister raises two arguments on appeal.  First, he argues that even if the manuscript was sufficiently indexed so that an interested researcher could learn of its existence and relevance, the task of traveling to Washington, D.C., and inspecting the manuscript at the Library of Congress was too burdensome for it to have been considered publicly accessible.  Second, he argues that the manuscript was not a printed publication as of the critical date because there is no evidence that it was included in a catalog or index at that time that would have permitted an interested researcher to discover it.  We address each argument in turn.

### 1.  Availability for Inspection

Dr. Lister analogizes this case to <u>Northern Telecom, Inc. v. Datapoint Corp.</u>, 908 F.2d 931, 936-37 (Fed. Cir. 1990), a case in which this court held that several documents relating to a military system for distributed computer processing of logistical data were not printed publications within the meaning of § 102(b) because they were not "generally available" to the interested public.  According to Dr. Lister, the burden of traveling to Washington, D.C., and navigating what he describes as the "cumbersome procedures" necessary to gain access to the manuscript precludes a finding of general

---

[1]    Under 37 C.F.R. § 201.2(d)(2), the Copyright Office will provide copies of copyrighted works in only three circumstances:  (1) the copyright holder provides written authorization; (2) a written request is filed by an attorney representing either a plaintiff or defendant in connection with litigation relating to the copyrighted work; or (3) the Copyright Office receives a court order for reproduction of a work that is the subject of litigation.

availability.  In support of his position, he cites a September 10, 2004 letter from the Copyright Office that states that it searched its records but did not find a single request for inspection of the manuscript.  Additionally, Dr. Lister emphasizes that the Copyright Office is unable to provide copies of the manuscript to interested researchers.  See 37 C.F.R. § 201.2(d)(2).  Thus, in Dr. Lister's view, the difficulty of accessing the manuscript, combined with affirmative evidence that no one has ever requested to inspect it, demonstrates that the manuscript was effectively unavailable to the public.

We cannot accept Dr. Lister's argument.  First, there is a critical difference between the requirements for obtaining access to the documents at issue in Northern Telecom and the steps that one must take to view the Lister manuscript at the Copyright Office.  In Northern Telecom, the documents were housed within the library at Mitre Corporation, and "[a]ccess to the library was restricted to persons authorized by Mitre." 908 F.2d at 936.  In contrast, in this case, any member of the public who submits a proper request is capable of gaining access to the manuscript without any need for special authorization.  Second, we have previously recognized that a reference can be considered publicly accessible even if gaining access to it might require a significant amount of travel.  See Hall, 781 F.2d at 899-900 (holding that a copy of a dissertation shelved in a library in Germany was a printed publication).  Additionally, as the Board noted, an interested person could hire someone local to inspect the manuscript on their behalf.  Finally, our cases have held that once accessibility is shown, it is unnecessary to show that anyone actually inspected the reference.  See, e.g., SRI, 511 F.3d at 1197 ("[A]ctual retrieval of a publication is not a requirement for public accessibility . . . ."); Constant, 848 F.2d at 1569 ("Accessibility goes to the issue of whether interested

members of the relevant public could obtain the information if they wanted to. If accessibility is proved, there is no requirement to show that particular members of the public actually received the information."). Finally, we agree with the Board that an interested researcher would be able to gain and retain an understanding of Dr. Lister's invention upon inspection of the manuscript and without any need to obtain a copy.

### 2. Existence and Adequacy of an Index

The above conclusion that the Lister manuscript was available at the Copyright Office for inspection by any interested person does not end our inquiry. We must also consider whether anyone would have been able to learn of its existence and potential relevance prior to the critical date. Dr. Lister argues that this criterion is not met for two reasons. First, he asserts that the catalogs and databases relied upon by the Board were not sufficiently searchable to lead an interested researcher to the manuscript. Second, he argues that even if some of the catalogs and databases were adequate, there is no evidence that the manuscript was in fact listed in any of them prior to the critical date.

The parties agree that the only evidence in the record pertaining to the cataloging or indexing of the Lister manuscript is a statement made by Dr. Lister in an Information Disclosure Statement ("IDS") filed with the USPTO during prosecution of his application. See Oral Arg., 20:31-47, June 4, 2009; available at http://oralarguments.cafc.uscourts.gov/mp3/2009-1060.mp3. In relevant part, that statement reads:

> [A]lthough the Copyright Office maintains a public record of the registrations of copyrighted works, searching of the catalog cannot be done by subject. See U.S. Copyright Office, How to Investigate The Copyright Status of a Work 4, Circular 22, Jan. 1991 (visited Dec. 30,

1997) <http://lcweb.loc.gov/copyright/circs/circ22> ("The Copyright Office does not maintain any listings of works by subject"). Effective with registrations made since 1978, copyright registration information is available to the public through an automated catalog, accessible either at the Library of Congress or over the Internet. [Id. at 3] Searching of the automated catalog can be performed by the first word in the title of the work or by the author's last name. However, the automated catalog does not enable subject matter searching or key word searching of the text of deposits. Telephone Interview with Copyright Information Specialist, U.S. Copyright Office (Jan. 6, 1998). . . .

Applicant further submits that any copyright information available through computerized databases such as DIALOG is not sufficiently indexed to make Applicant's deposited work § 102(b) prior art. The information contained in these databases comes directly from the Library of Congress, and therefore is available in essentially the exact same format as found in the automated catalog of the Library of Congress. Telephone Interview with Linda Jarmy, Catalog Distribution Service, Library of Congress (Jan. 9, 1998). Computerized searching in these databases does <u>not</u> offer subject matter searching of copyright registrations. The only additional feature offered by computerized searching, such as in the WESTLAW database, is the ability to search the title of works using key words.

J.A. 122-23 (footnote omitted).

As stated in the IDS and confirmed by the parties at oral argument, the undisputed facts relating to the indexing of the manuscript are summarized as follows. There are three relevant databases, the Copyright Office's automated catalog and two commercial databases, Westlaw and Dialog. The automated catalog was not sorted by subject matter and could only be searched by either the author's last name or the first word of the title of the work. Westlaw and Dialog obtained the automated catalog data from the Copyright Office and entered it into their own databases. Users of the Westlaw and Dialog databases could perform keyword searches of the titles, but not the full texts, of the works.

Relying on <u>Cronyn</u>, Dr. Lister argues that none of the databases indexed or cataloged the manuscript in a "meaningful way" that would permit a researcher to locate

it.  See 890 F.2d at 1161.  With respect to the Copyright Office's automated catalog, he asserts that neither searching by author nor the first word in the title ("Advanced") would guide a researcher interested in his golfing method to the manuscript.  At oral argument, the government conceded that the automated catalog alone would have been insufficient to support a finding of public accessibility.  Oral Arg. at 18:48-19:08, 29:47-30:05; cf. Cronyn, 890 F.2d at 1161 ("Here, the only research aid was the student's name, which, of course, bears no relationship to the subject of the student's thesis.").

Turning to the Westlaw and Dialog commercial databases, which, unlike the Copyright Office's automated catalog, permit the searching of titles by keyword, Dr. Lister argues that the Board erred by concluding that a researcher would have found the manuscript by searching for the word "golf" in combination with the word "handicap." Dr. Lister criticizes the Board's conclusion as not taking into account the possibility that such a search would have either inundated the researcher with hundreds or thousands of irrelevant results or failed to retrieve relevant documents that happened not to include both words in their title.  Additionally, he suggests that the term "handicap" is not a good descriptor of the invention because it is not used in any of the claims and that an interested researcher would have used other search terms, such as "tee" or "ball," which would not have yielded the manuscript.

Dr. Lister attempts to impose too rigid of a test for whether an interested researcher could find a reference.  The question is not whether an individual, selecting terms from the claim language, could execute a single keyword search that would yield all relevant references including the anticipatory reference at issue.  Rather, our inquiry is whether it could be located by "persons interested and ordinarily skilled in the subject

matter or art <u>exercising reasonable diligence</u>." <u>Kyocera</u>, 545 F.3d at 1350 (emphasis added) (quotation marks omitted). A reasonably diligent researcher with access to a database that permits the searching of titles by keyword would be able to attempt several searches using a variety of keyword combinations. We agree with the Board that an individual interested in ways to expedite the game of golf and make it easier for casual players would be inclined to use "handicap" as a search term. Indeed, Dr. Lister used the term in his specification to describe his invention. <u>See, e.g.</u>, J.A. 81 ("In accordance with one embodiment the present invention provides . . . a golf handicap method (T Handicap) which generally involves the unrestricted use of teeing the ball after the first shot, except in hazards and greens."). Regardless of whether Dr. Lister views other search terms as more descriptive of his invention, a reasonably diligent researcher would have searched for "golf" in combination with "handicap."[2] Accordingly, we conclude that the Lister manuscript was publicly accessible as of the date that it was included in either Westlaw or Dialog, the databases that permitted keyword searching of titles.

In order for the manuscript to be a bar to patentability under § 102(b), it must have been publicly accessible more than one year prior to Dr. Lister filing his application on August 5, 1996. Dr. Lister argues that there is no evidence that it was in fact included in either Westlaw or Dialog prior to the critical date.[3] <u>See</u> Manual of Patent

---

[2] Because there is no evidence in the record suggesting that such a search would have yielded an unmanageable number of references, we need not decide whether in some circumstances an overwhelming number of search results might warrant a conclusion that a particular reference included in the list was not publicly accessible.

[3] The government argues that Dr. Lister waived this argument by failing to raise it before the Board. Although it may not have been the primary focus of the brief

2009-1060                                    14

Examining Procedures § 2128 ("Prior art disclosures on the Internet or on an on-line database are considered to be publicly available as of the date the item was publicly posted. Absent evidence of the date that the disclosure was publicly posted, if the publication itself does not include a publication date (or retrieval date), it cannot be relied upon as prior art under 35 U.S.C. 102(a) or (b)."). The government offers two responses, neither of which is persuasive.

First, it asserts that Dr. Lister's IDS provides substantial evidence that the manuscript was listed in the commercial databases prior to the critical date. At oral argument, the government relied on the portion of the IDS stating that "[t]he information contained in [the commercial] databases comes directly from the Library of Congress." J.A. 123 (emphasis added); see Oral Arg. at 21:25-24:10. In the government's view, the use of the word "directly" is sufficient evidence that the manuscript was listed in either Westlaw or Dialog shortly after the Copyright Office issued Dr. Lister's certificate of registration on July 18, 1994. We disagree. We see nothing in the IDS that speaks to the date on which the Lister manuscript was incorporated into the Westlaw and Dialog databases. When pressed to identify such a date at oral argument, the government's only answer was "directly around the time of the Copyright Office's housing [of the manuscript]." Oral Arg. at 23:48-24:10. The government asks us to read too much into the word "directly." There is no indication that that portion of the IDS was meant to address the timing of the database updates and, indeed, Westlaw or Dialog could acquire the catalog information "directly from the Library of Congress" ten years after it

he submitted to the Board, we nevertheless find that the brief sufficiently expressed Dr. Lister's disagreement with the examiner's finding that the manuscript was listed in a keyword searchable database prior to the critical date. See J.A. 296-98.

was first generated for the Copyright Office automated catalog. Further, there is no other evidence that speaks to the timing or process by which Westlaw or Dialog incorporated the Copyright Office's updated automated catalog information into their databases. Although "evidence establishing a <u>specific</u> date of cataloging" was not required in <u>Hall</u>, in that case we held that "competent evidence of the general library practice" of cataloging and shelving established that the thesis became accessible prior to the critical date. 781 F.2d at 899. In contrast, in this case the government has not identified any evidence of the general practice of the Copyright Office, Westlaw, or Dialog with regard to database updates. Absent such evidence, we have no basis to conclude that the manuscript was publicly accessible prior to the critical date.

The government's second argument is that it made a prima facie showing that the manuscript was included in the commercial databases shortly after the Copyright Office granted the certificate of registration and the burden has shifted to Dr. Lister to present evidence that it was <u>not</u> in either database before the critical date. Because he has presented no such evidence, the government asserts that Dr. Lister has failed to meet his burden and it was proper for the Board to make a finding in the government's favor. We do not agree that the government has established a prima facie case that warrants shifting the burden to Dr. Lister. Essentially, the evidence shows that at some point in time Westlaw and Dialog incorporated the Copyright Office's automated catalog information about the Lister manuscript into their own databases. There is no indication as to when that occurred or whether it was prior to the critical date. We see little difference between the evidence in this case and a situation in which an examiner comes across an undated reference that discloses an invention for which an applicant is

seeking the patent. We surely would not view the mere existence of the reference in the latter scenario as prima facie evidence that it was available prior to the applicant's critical date. The government urges us that it is appropriate in this case to presume that the manuscript information was added to the Westlaw and Dialog databases prior to the critical date because the critical date was more than a year after the certificate of registration was granted. However, absent any evidence pertaining to the general practices of the Copyright Office, Westlaw, and Dialog, or the typical time that elapses between copyright registration, inclusion in the Copyright Office's automated catalog, and subsequent incorporation into one of the commercial databases, any presumption along those lines would be pure speculation.

Because the evidence contained in the IDS neither provides substantial evidence that the Lister manuscript was publicly accessible as of the critical date nor suffices to prove a prima facie case of accessibility that would shift the burden to Dr. Lister to show inaccessibility, we conclude that the Board erred in affirming the examiner's § 102(b) rejection.

## III. CONCLUSION

For the foregoing reasons, we vacate the Board's decision and remand for further proceedings consistent with this opinion.[4]

## VACATED AND REMANDED

---

⁴ Citing the thirteen-year pendency of his application, Dr. Lister also asks us to issue an order requiring the USPTO to conclude prosecution and issue a notice of allowance. Dr. Lister did not argue to the Board that the allegedly excessive delays during prosecution entitle him to the issuance of a patent. Accordingly, that issue is not properly before us. See In re Watts, 354 F.3d 1362, 1367-68 (Fed. Cir. 2004). Additionally, we note that our decision is limited to the question of whether the Board properly affirmed the examiner's § 102(b) rejection. Other bars to patentability are not before us and may be raised during the proceedings on remand.